# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### ORLANDO DIVISION

**CARL DELANO TORJAGBO,**

                    **Plaintiff,**

**-vs-**                                                              **Case No.  6:05-cv-419-Orl-28KRS**

**UNITED STATES OF AMERICA,**

                    **Defendant.**
_____

# ORDER

On February 1, 2002, Plaintiff, Carl Delano Torjagbo, who is proceeding *pro se*, was injured in an emergency landing after the Cessna aircraft he was flying lost engine power. This cause is before the Court on the United States' Combined Motion to Dismiss and Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 29), Plaintiff's Motion and Exhibits to Strike (Doc. 32), which is treated as a response in opposition to Defendant's motion, and the parties' supplemental briefing (Docs. 40 & 41.)

## I. Background

Patrick Air Force Base ("PAFB") operates an Aero Club, which provides "eligible United States Air Force personnel an opportunity to enjoy recreational flying, participate in professional aviation training programs, and enjoy safe, low-cost aircraft operations." (Doc. 32 at 2-3 (citing Air Force Instruction 34-217 ¶ 1.2).)  Plaintiff, a flight instructor at the PAFB Aero Club, was instructing a student pilot in the techniques of cross-country flight on February 1, 2002 in a Cessna model R172E (Air Force model T-41) aircraft, which departed

the PAFB at approximately 11:00 in the morning.  Plaintiff did not file a flight plan, and according to Defendant the plane "was not under the positive control of an air traffic controller."  (<u>Id.</u> at 3.)

The pilots first landed at La Belle Municipal Airport where they rested and conducted a visual inspection of the aircraft.  While en route back to Patrick AFB, the pilots noticed an oil spray on the windshield.  Soon thereafter the aircraft's engine surged and lost partial power.  Plaintiff took control of the plane and radioed the Air Traffic Control Tower at PAFB. The controller initially advised Plaintiff of the radio frequency for Daytona Approach Control for directions to the nearest airport, but fifty-five seconds later the controller corrected the transmission and  attempted to provide the frequency to the Miami Center.  There is no evidence that Plaintiff received that transmission.  Daytona Approach Control provided Plaintiff with the Miami frequency, but by that point Plaintiff was committed to landing the plane.  Plaintiff successfully made an emergency landing in a grassy pasture, with a landing speed of 85 miles per hour.  Unfortunately, the plane then hit a rise in the terrain, lifted from the ground, and crashed nose first into the pasture.  Plaintiff broke his wrist and jaw.  He was unable to assist the student pilot out of the aircraft, so he walked to a nearby road, flagged down a car, and obtained assistance.

On May 13, 2003, Plaintiff, represented by an attorney, filed an administrative claim (Standard Form 95) with the Claims Office at PAFB.  The claim alleged that Plaintiff's injuries were caused by engine failure resulting from the "negligent repair, maintenance, and inspection of the plane by Patrick air force maintenance personnel."  (Ex. 1 to Doc. 29, Admin. Claim.)  "On November 23, 2004, Plaintiff's administrative claim was denied by the

Air Force Legal Services Agency on the basis that the investigation into the accident revealed no causal negligence by any employee of the United States."[1]  (Doc. 29 at 7.)  On about March 9, 2005, Plaintiff wrote Glenn Parr, Chief of the Aviation and Admiralty Law Branch Tort Claims and Litigation Division, advising of his attorney's resignation and requesting a release of information and aircraft parts for analysis.  (Ex. 10 to Doc. 29.)  In response, Mr. Parr indicated that he forwarded the information request to the appropriate office for processing and asked Plaintiff to "advise if [he] intended [his] letter to be a written request for reconsideration of [the] final denial of [the] claim pursuant to the Code of Federal Regulations, 28 C.F.R. § 14.9(b)."  (Ex. 11 to Doc. 29.)  On March 30, 2005, Plaintiff indicated that he did wish to have the denial of his claims reconsidered.  (Ex. 12 to Doc. 29.)

Denying Plaintiff's claim again after reconsideration, Colonel Rissling, Chief of Tort Claims and Litigation Division of the Air Force Legal Services Agency, wrote, "As you were the pilot operating the airplane when it crashed, you would have to establish that improper aircraft care and maintenance by aero club personnel caused the accident.  Neither your original claim nor your request for reconsideration present[s] such evidence."  (Ex. 2 to Doc. 29, dated Apr. 12, 2005.)[2]  According to Plaintiff's Motion to Strike, Plaintiff interpreted this letter as a request for additional evidence.  (Doc. 32 at 6.)  On April 15, 2005, Plaintiff wrote

---

[1] The initial letter denying Plaintiff's claim dated November 23, 2004 is not attached to either party's pleadings, but it is referenced in the final denial after reconsideration dated April 12, 2005.  (Ex. 2 to Doc. 29.)

[2] Additionally, Colonel Rissling informed Plaintiff that his "claim [was] barred as a matter of law because [Plaintiff] executed a clear and unequivocal Covenant Not To Sue and Indemnity Agreement that insulates the Patrick Air Force Base Aero Club and the United States from liability."  (Ex. 2 to Doc. 29.)

Colonel Rissling and Mr. Parr attempting to amend his request for reconsideration, raising, for the first time, an additional claim that PAFB's air traffic controller was negligent in handling his request for assistance.  (Ex. 13 to Doc. 29 ¶ 4.) On April 19, 2005, Mr. Parr advised Plaintiff "that the administrative process for considering the referenced claim concluded on April 12, 2005" and that "a response to the assertions in [Plaintiff's] latest communication would not be appropriate, other than to say [that they were] previously considered and rejected."  (Ex. 3 to Doc. 32.)   Prior to the denial of his request for reconsideration, Plaintiff filed the instant Complaint under the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346(b), alleging that Defendant's employees were negligent in maintaining the aircraft and "in proper handling of the emergency."  (Pl.'s Compl. ¶ 7, Doc. 1.)  Defendant also moves to dismiss Plaintiff's air traffic controller claim, arguing the Court lacks subject matter jurisdiction because the claim was never presented during the administrative proceedings.  (Doc. 29.)  Defendant moves for summary judgment on the maintenance claim, arguing that the evidence establishes that the aircraft was properly maintained, that there is no direct evidence of negligence or causation, and that the doctrine of *res ipsa loquitur* does not apply to aircraft accident cases.[3]

## II. Applicable Legal Standards

For a district court to entertain a claim, the court must have subject matter jurisdiction

---

[3] In a footnote in their motion, Defendant raised a Covenant Not to Sue and Indemnity Agreement Plaintiff allegedly signed, stating, "Should the Court address the merits of Mr. Torjagbo's claims, this Covenant will be raised by the United States as a defense at trial." (Doc. 29 at 4 n.2.)  The Court asked the parties to provide supplemental argument addressing the Covenant on June 4, 2007.  (Doc. 37.)

"over the category of the claim in suit."  Johnson v. Hairston, No. 3:06-cv-812, 2007 WL 748479, at *3 (M.D. Ala. Mar. 8, 2007) (citing Ruhrgas AG v. Marathon Oil Co., 526 U.S. 574, 577 (1999)).  Under the FTCA, subject matter jurisdiction is conferred upon a district court only after a plaintiff has first made a claim to the appropriate federal agency and received a final denial of that claim.  "The [FTCA] provides that an 'action shall not be instituted upon a claim against the United States for money damages' unless the claimant has first exhausted his administrative remedies." O'Brien v. United States, 137 Fed. Appx. 295, 300-01 (11th Cir. 2005) (quoting McNeil v. United States, 508 U.S. 106, 107 (1993), and 28 U.S.C. § 2675(a)).  The requirement that a plaintiff exhaust available administrative remedies before proceeding to court is jurisdictional and is thus not waivable by the United States.  Johnson, 2007 WL 748479, at *3; see also Burchfield v. United States, 168 F.3d 1252, 1254-55 (11th Cir. 1999).  "Consequently, when a litigant attempts to bring suit without first exhausting available administrative remedies, the federal court is powerless to act." Johnson, 2007 WL 748479, at *3.  A motion to dismiss for lack of subject matter jurisdiction brought pursuant to Rule 12(b)(1), Federal Rules of Civil Procedure, may be brought at any time during the course of the proceedings.  See Barnett, 283 F.3d at 1237; Rhodes v. United States, No. 8:06-cv-17, 2007 WL 1173790, at *1 (M.D. Fla. Apr. 18, 2007); Bush v. United States, 703 F.2d 491, 494 (11th Cir. 1983).

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  The moving party bears the burden of

establishing that no genuine issues of material fact remain.  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." <u>Gargiulo v. G.M. Sales, Inc.</u>, 131 F.3d 995, 999 (11th Cir. 1997).  "A nonmoving party, opposing a motion for summary judgment supported by affidavits [or other relevant evidence] cannot meet the burden of coming forth with relevant competent evidence by simply relying on legal conclusions or evidence which would be inadmissible at trial." <u>Avirgan v. Hull</u>, 932 F.2d 1572, 1577 (11th Cir. 1991); <u>see also</u> Fed. R. Civ. P. 56(e).

In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 255 (1986).  "[A]t the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Id.</u> at 249.  Some degree of factual dispute is expected, but to defeat a motion for summary judgment the factual dispute must be material and genuine; it must "affect the outcome of the suit" and must be "such that a reasonable jury could return a verdict for the nonmoving party." <u>Id.</u> at 248.

III. Analysis

<u>A. Plaintiff's Air Traffic Controller Claim Must Be Dismissed Because the Claim Was Not Presented for Administrative Review</u>

At the heart of the FTCA's exhaustion requirement is notice.  One purpose of the notice requirement is to give federal agencies "a fair opportunity to investigate and possibly

-6-

settle the claim before the parties must assume the burden of costly and time-consuming litigation." McNeil, 508 U.S. at 111-12.  The question before the Court is whether the allegations in Plaintiff's administrative claim to the Air Force Legal Services Agency gave the United States notice that Plaintiff was alleging that PAFB's air traffic controller was negligent in handling his emergency request for assistance.  A claimant is not required "to provide the agency with a preview of his or her lawsuit by reciting every possible theory of recovery, or every factual detail that might be relevant." Burchfield, 168 F.3d at 1255.  "All that is required is that the theory put forward in the complaint filed in the district court be based on the facts that are stated in the administrative claim." Id. at 1256.  "If the claim 'fairly apprises the government of the facts leading to the claimant's injury, new theories of why those facts constitute tortious conduct can be included in a federal court complaint.'" Bush, 703 F.2d at 494 (quoting Rise v. United States, 630 F.2d 1068, 1071 (5th Cir. 1981)).

In an attachment to Plaintiff's Standard Form 95, entitled "Basis of Claim," Plaintiff indicated the following "Facts Attending the Damage":

> On February 1, 2002, at about 1330 hours e.s.t., Carl Torjagbo (Claimant) and Ernest Wuerz crash landed in a Cessna R172E airplane, Registration No. N7878N, after the plane's engine failed.  The plane was owned and maintained by the United States Air Force, Patrick Air Force Base.  At the time of the crash, Carl was a flight instructor for the Patrick Air Force Base Aero Club, and Ernest Wuerz was a student of the Aero Club. The crashed flight was a cross-country instructional flight, and left out of Patrick A.F.B. at approximately 1107 hours.  (See attached FAA Accident/Incident Report)

(Ex. 1 to Doc. 29.)  Later, in the attachment, Plaintiff alleges that "[t]he crash and injuries to Carl resulted from engine failure caused by negligent repair, maintenance, and inspection

of the plane by Patrick Air Force Base personnel." (Id.)  Plaintiff provided further factual

allegations pertaining to the maintenance and repair of the plane's engine and fuel system.

(Id.)  Nowhere in his administrative claim does Plaintiff reference the conduct of the air traffic

controllers as being negligent or a contributory cause of his injuries.  His administrative claim

is devoid of any reference to air traffic controllers.  Plaintiff's original claim pointed only to

negligence in maintaining and repairing the aircraft, suggesting a mechanical defect as the

cause of his injuries.  This allegedly negligent conduct occurred prior to the accident if it

occurred at all.  By contrast, Plaintiff's alleged fault with the air traffic controller's conduct

occurred after his plane already suffered from engine failure.  Nothing in his administrative

complaint could have suggested to Defendant that Plaintiff also linked his injuries to the

actions of PAFB's air traffic controllers.  See Orlando Helicopter Airways v. United States,

75 F.3d 622, 626 (11th Cir. 1996) (holding that claimant's contract claim did not give notice

of its complaint's tort claims for malicious prosecution and abuse of process even though the

administrative claim referenced a whistle blower who gave false information resulting in

unwarranted, costly investigation of the claimant's activities); Bush, 703 F.2d at 495

(dismissing for lack of subject jurisdiction a claim based on factual allegations that were not

presented to the appropriate federal agency); Franz v. United States, 414 F. Supp. 57, 58-59

(D. Ariz. 1976) (holding that Plaintiff could not present two distinct sets of negligent acts

occurring at two different times as contributing causes of the same loss at trial when only one

allegation of factual negligence was presented in his administrative claim).

      Plaintiff claims that he "amended the claim to include air traffic control negligence and

a number of facts supporting negligence in maintaining aircraft after receiving more

information from the Pentagon."[4] (Doc. 32 at 6 (referencing Ex. 3, Pl.'s Letter dated Apr. 15,

2005).)  A "claimant may amend a claim . . . at any time prior to final agency action or prior

to the exercise of the claimant's option under 28 U.S.C. § 2675(a)."  10 C.F.R. § 14.25.

Plaintiff's attempt to amend his claim, however, served as a response to Defendant's final

denial of Plaintiff's claim after reconsideration, which Plaintiff mistakenly construed as a

request for additional evidence in support of his claims.  (See also Doc. 40 at 1 (indicating

that the final denial was "requesting me to provide more proof of negligent and wrongful act

(sic) or omission (sic) of the Government Employees acting within the scope of

employment").)  His letter of April 15, 2005 was received more than three years after his

accident and almost one full month after he had filed the instant action before the Court.

Plaintiff's attempt to amend his claim was unsuccessful and it was untimely.  The statute of

limitations for bringing new claims had already passed.  See 28 U.S.C. § 2401(b).  "[A] suit

brought under the Federal Tort Claims Act cannot include additional claims never presented

to the appropriate federal agency and finally denied by such agency as required by Title 28,

United States Code, Section 2675(a)."  Franz, 414 F. Supp. at 59.  Because Plaintiff failed

to exhaust his administrative remedies with respect to his claim that the air traffic controllers

---

[4] Plaintiff does not identify what new information he received from the Pentagon that supposedly informed him of his air traffic controller claim except to say that his information requests "did not yield the radio communication transcripts."  (Doc. 32 at 7.)  He cannot argue he was unaware of this claim until he received information from the Pentagon because he apparently has an independent recollection of his interactions with the air traffic controllers.  Plaintiff disputes the accuracy of the air traffic controller transcript and provided amendments to it, indicating his version of events.

were negligent in handling his emergency, the claim must be dismissed.[5]

    **B.  Plaintiff's Execution of an Enforceable Covenant Not to Sue and Indemnity
Agreement Bars His Negligent Maintenance Claim**[6]

On June 4, 2007, the Court ordered the parties to provide supplemental argument on

two issues: 1) the impact of Plaintiff's admission that he signed a Covenant Not to Sue and

Indemnity Agreement, and 2) if Plaintiff did sign the covenant, whether it is enforceable.

(Order at Doc. 39.)  Plaintiff submitted his supplemental brief on June 14, 2007 (Doc. 40) and

-----------------------

[5] Plaintiff's *pro se* status does not excuse his failure to exhaust his administrative
remedies as to this claim because although "*pro se* litigants are entitled to have their
pleadings liberally construed, procedural rules such as exhausting administrative remedies
before filing suit were specifically excluded from that rule."  O'Brien, 137 Fed. Appx. at 301
(citing McNeil, 508 U.S. at 113).

[6] Because the Court's ruling rests on the Covenant Not to Compete, the Court need
not consider whether *res ipsa loquitur* is applicable to Plaintiff's suit.  See Williams v. United
States, 218 F.2d 473, 475-76 (5th Cir. 1955) (declining to apply *res ipsa* to suit involving an
airplane accident).  The Court further notes that Plaintiff's expert, after reviewing the NTSB
investigative report, was unable to conclude that negligent maintenance was the cause of
the crash, stating:

    Q: Your review of the historic maintenance records –
    A: Yes, ma'am.
    Q: What was your conclusion after reviewing those?
    A: It was a correctly-maintained airplane.
    Q: Did you find anything within those maintenance records that
    would – that you – where you drew a connection to the cause of
    this accident?
    A: No, ma'am, I did not.

(Sevier Dep. at 20-21.)  Furthermore, the NTSB report identified three possible causes of
engine failure: a leaking O-ring, fuel contamination, and fuel pressure abnormalities.  (Sevier
Rep., Ex. 17 to Doc. 29.)  Mr. Sevier concluded that while those three conditions were the
"most probable cause of the Engine Failure," id., he could not link any of those conditions to
the maintenance of the aircraft and even suggested that the conditions could have resulted
from impact.  (Sevier Dep. at 47-48.)  There is no evidence to support Plaintiff's claim that the
airplane was negligently maintained.

Defendant submitted its brief on June 22, 2007 (Doc. 49).  After considering the parties' arguments, the relevant evidence, and pertinent case law, summary judgment is due to be granted to Defendant on Plaintiff's claim that the aircraft was negligently maintained.

Plaintiff, faced with a properly supported motion for summary judgment, was required to "come forward with specific factual evidence, presenting more than mere allegations." Gargiulo v. G.M. Sales, Inc., 131 F.3d 995, 999 (11th Cir. 1997).  "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial."  Farley v. Am. Cast Iron Pipe Co., 115 F.3d 1548, 1551 (11th Cir. 1997) (citing Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)). "An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is 'merely colorable' or is 'not significantly probative.'" Servicetrends, Inc. v. Siemens Med. Sys., Inc., 870 F. Supp. 1042, 1051 (N.D. Ga. 1994) (quoting Anderson, 477 U.S. at 247-48)).  "When evaluating the merits of a motion for summary judgment, the court must view the evidence and factual inferences in a light most favorable to the non-moving party.  See Rollins v. TechSouth, Inc., 833 F.2d 1525, 1528 (11th Cir. 1987).  However, unsupported self-serving statements by the party opposing summary judgment are insufficient to avoid summary judgment. See Midwestern Waffles, Inc. v. Waffle House, Inc., 734 F.2d 705, 714 (11th Cir. 1984))."  Johnson v. Fulton Concrete Co., 330 F. Supp. 2d 1330, 1334 (N.D. Ga. 2004).  "Resolving all doubts in favor of the nonmoving party, the court must determine 'whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented.'" Id. (quoting Anderson, 477 U.S. at 252).

On May 15, 2001, a Covenant Not to Sue and Indemnity Agreement was executed at PAFB for use in conjunction with Aero Club activities.  (Ex. 5 to Doc. 29.)  The printed name on the form is Carl Torjagbo.  (Id.)  The signatures reflect the names of Carl Torjagbo and Donald M. Opel, the Aero Club Chief Flight Instructor.  (Id.)  During Plaintiff's deposition, he testified that he did not remember signing the document.[7]  (Torjagbo Dep. at 32-44.)  He

────────────────────

[7] The following deposition excerpts relate to the Covenant Not to Sue:
Q: Sir, does your signature appear on that document?
A: Looks like it, but I don't recall signing this.
Q: Can you identify your signature?
A: Looks a little different . . . Looks like my signature, but not exactly.
Q: Do you have reason to believe that someone else has signed your name to this document?
A: I cannot comment on that, because I don't know.
 * * *
Q: Are you testifying here today that your signature is not on this document?
A: It looks like my signature, but I don't recall signing it.
Q: That's not my question.  My question is, is that your signature on this document?  I'm not asking whether you remember signing it, I'm asking is that your signature on this document?
A: No.
Q: That is not your signature?
A: No.
Q: So it is your testimony here today that someone else signed your name to that document?
A: I am not saying that, because I don't know.
Q: Would you agree with me, though, that your name appears on that document in the form of a signature, correct?
A: Yes, I see my name on there, but I did not recall signing it. The signature looks like my signature, but I cannot say someone else has signed it, so I cannot answer that question.
Q: While you were working at the Patrick Aero Club, did you sign a "Covenant Not to Sue and Indemnity Agreement?"
A: Not that I recall.
Q: Is your testimony that you did not, or is your testimony that you don't remember?

therefore argued at his deposition that he should not be bound by it.  (Id. at 44-48.)  Plaintiff's

self-serving denial is the only evidence supporting his claim that he did not execute the

Covenant Not to Sue.  There is no genuine disputed issue of fact as to whether Plaintiff

executed the Covenant Not to Sue.

Despite Plaintiff's denial, overwhelming evidence supports the conclusion that Plaintiff

did execute the Covenant Not to Sue.  Facing this evidence, no rational jury could conclude

otherwise and so the disputed issue of fact, while material to the outcome of the case, is not

genuine; it cannot permit Plaintiff to avoid summary judgment.  Initially, the executed

document appears to bear Plaintiff's signature and printed name.  (Ex. 5 to Doc. 29.)  During

Plaintiff's deposition, he stated that he first recalled seeing the document when his attorney

showed it to him and that he had never discussed any "Covenant Not to Sue" with anyone

at PAFB, including his students.  (Torjagbo Dep. at 38, 42.)   In his recently submitted

supplemental brief, however, Plaintiff remembers:

> After I completed the test Don Opel the chef (sic) flight instructor
> graded the test.  He handed me a signed Covenant Not to Sue
> Form and simply said [']fill in the blanks and date and sign it.[']  We
> are all required to sign it before we get on an airplane . . . . I filled
> out the document but because I did not fully understand the
> implications of the document I gave it to Holly the secretary and
> told her I will read it thoroughly and sign it when I . . . was done
> with the preflight . . . . There was no signature on the document
> until the accident happened.  Then my files were seized and
> locked away.  Then a signature appears on it.  As an instructor, I
> also did most of the club members initial check outs . . . . For the

A: I don't remember.

(Torjagbo Dep. at 32-34.)  Plaintiff now claims that his signature has been forged.  (Doc. 40
at 3.)

-13-

> initial members who had to sign that Covenant the most frequently
> asked question by the students were (sic) does it mean I am not
> going to sue you just for today if something happens?

(Doc. 40 at 2.)  Plaintiff's current position is inconsistent with the position he took in his

deposition.  His deposition statements also directly contradict his previous admission that

he signed the document.

On April 15, 2005, in response to a letter reaffirming the denial of Plaintiff's claim

wherein the Covenant Not to Sue was raised as a defense to liability, Plaintiff wrote:

> As for the Covenant not to sue, it is not clear and unequivocal.  It
> is ambiguous And both you and [I] know it will be thrown out of
> court because
>
> a.  It does not have my full name.  The Pilot in command is Carl
> Delano Torjagbo not Carl Torjagbo[.]
>
> b.  It is not a Barr (sic) if it is negligence.  There are provision[s]
> in public law that Prevents (sic) you from using that to shield
> yourself from torts you commit.
>
> c.  It was not filled out properly.  It does not say which aero club
> I was working for.  Both you and I know that these agreements
> are over a period of time.  We are required to renew them every
> year.  *My understanding when I was Signing that was not to sue
> on the date stated on the sheet.  There is no such Law in the
> history of mankind that allows you to contract your right's* (sic)
> *away Forever.*

(Ex. 13 to Doc. 29 at 5 (emphasis added).)

Plaintiff claims that this statement was not an admission but a hypothetical argument

against the validity of the Covenant if one assumed that he did actually sign it.  (Doc. 40 at

1 ("I want to make it clear to the court, Defendant the United States of America and the

whole world that my response in that letter was NOT an admission that I signed the

Covenant not to Sue.  I was simply trying to explain to Glenn Parr and his colleagues

assuming that I signed it which I did not.  Just by looking at the document that is what it appears to say.").)  Although Plaintiff asserts that this statement was merely a hypothetical argument, there are no such words of limitation in his letter.  More importantly, when presented with his first opportunity to argue against the validity of the Covenant Not to Sue, Plaintiff did not argue that he had not signed the document, that he had never seen the document, or that his signature had been forged.  Rather, the context of his admission "when I was Signing that" was his understanding that the covenants are valid "over a period of time" and that "[w]e are required to renew them every year."  (Ex. 13 to Doc. 29 at 5.)

Air Force regulations require all persons participating in Aero Club aircraft activity to complete Air Force Form 1585, the Covenant Not to Sue.  (Air Force Manual 34-232, Aero Club Operations ¶ 3.5.4, attached as Supp. Ex. B to Doc. 41.)  Donald Opel has testified that while he does not specifically remember witnessing Plaintiff sign the document, it is his routine business activity to require every applicant to execute a covenant, which he then witnesses.  (Opel Decl. ¶¶ 15, 17 ("As part of the flight instructor interview process, I would conduct a check ride with the applicant to observe the pilot's skills first hand.  I required each and every candidate to complete a Covenant Not To Sue prior to taking part in the check ride, as required by Air Force regulation."))  Those who do not sign the document are not hired and do not participate in a check ride.  (See id. ¶ 19.)  If an Aero Club participant has not completed a Covenant Not to Sue, the computerized aircraft dispatch system will not dispatch an aircraft to that pilot.  (Id. ¶¶ 9-12.)  Plaintiff was trained and knowledgeable about all applicable Air Force regulations, including those pertaining to the Covenant Not to Sue.  (Id. ¶ 13.)  According to Air Force policy and procedure, it would not have been possible for

Plaintiff to fly without having executed a Covenant Not to Sue.

Finally, Linda J. Hart, a forensic document examiner with more than thirty years' experience, compared the uncontested signatures and hand lettering of Plaintiff to the signature and printed name appearing on the Covenant Not to Sue.  (Ex. 3 to Doc. 41.) Overall, twenty-three uncontested samples of writing were compared to the disputed writing. (Id.) Ms. Hart's conclusion was that Plaintiff, Carl Torjagbo, signed the Covenant and wrote his name in printed hand at the top of the form.[8]  (Id.)

In light of the overwhelming evidence supporting the conclusion that Plaintiff executed the Covenant Not to Sue and Indemnity Agreement, including the forensic handwriting analysis of his signature, the declaration of Donald Opel, Plaintiff's own admission in 2005 that he signed the document, his failure to raise the validity of his signature at his first opportunity, and Air Force regulations requiring that the Covenant be executed before being hired or permitted to fly, the Court must conclude that the dispute of fact created by Plaintiff's current and inconsistent[9] denial is insufficient to create a genuine issue to be tried by a jury. Because no rational jury could conclude that Plaintiff's signature was forged, the Court must now consider whether the Covenant Not to Sue is enforceable against Plaintiff.

---

[8] Since initially denying having ever seen the document, Plaintiff has since admitted filling it out, but he still contends he did not sign it.  (Doc. 40 at 2.)

[9] Although the Court has pointed to the inconsistencies in Plaintiff's testimony and statements, the Court has not reached its decision by judging Plaintiff's credibility, which is prohibited on summary judgment.  See Mize v. Jefferson City Bd. of Educ., 93 F.3d 739, 742-43 (11th Cir. 1996).  Indeed, as the non-moving party, Plaintiff is entitled to have all evidence construed in a light most favorable to him.  On balance, however, the objective evidence is so one-sided that Plaintiff's after-the-fact, self-serving denial would not permit a reasonable fact finder to conclude that Plaintiff did not execute the Covenant.

Although the law generally disfavors exculpatory clauses, Florida law firmly upholds and enforces "clear and unequivocal exculpatory clauses which purport to release a party from liability for its own negligence."  Shaw v. Premier Health & Fitness Ctr., Inc., 937 So. 2d 1204, 1204-05 (Fla. 1st DCA 2006) (citing Borden v. Phillips, 752 So. 2d 69, 73 (Fla. 1st DCA 2000)).  The Covenant Not to Sue states:

> In consideration of the Aero Club permitting me to participate in these activities, I . . . covenant and agree that I will never institute, prosecute, or in any way aid in the institution or prosecution of, any demand, claim, or suit against the US Government for any destruction, loss, damage, or injury *(including death)* to my person or property which may occur from any cause whatsoever as a result of my participation in the activities of the Aero Club.
>
> \*   \*   \*
>
> I know, understand, and agree that I am freely assuming the risk of my personal injury, death, or property damage, loss or destruction that may result while participating in Aero Club activities, including such injuries, death, damage, loss or destruction as may be caused by the negligence of the US Government.

(Ex. 5 to Doc. 29.)  The clauses are clear and unambiguous and they specifically release Defendant from liability for its own negligence.  The wording is clear and absolute; any reasonable person signing this document would understand "what he is contracting away." Lantz v. Iron Horse Saloon, Inc., 717 So. 2d 590, 591-92 (Fla. 5th DCA 1998) (quoting Greater Orlando Aviation Auth. v. Bulldog Airlines, Inc., 705 So. 2d 120, 121 (Fla. 5th DCA 1998)).

None of Plaintiff's arguments is persuasive.  No legal principle requires a party to include his middle name in order to make a document valid and enforceable.  If there were

-17-

such a principle, a party could always escape contractual liability by omitting his middle name – an absurd result.  While Plaintiff is correct that a forged document is unenforceable, there is no evidence supporting his contention that the document is forged; all available evidence suggests that Plaintiff signed the Covenant.  Finally, Plaintiff's citations to authority examining exculpatory clauses that did not explicitly exempt the defendant from liability for its own negligence are inapposite.  The Covenant Not to Sue at issue here plainly exempts Defendant from liability for personal injury and even death, even that which is caused "by the negligence of the [United States] Government."  (Ex. 5 to Doc. 29.)

## IV.  Conclusion

Count I of Plaintiff's Complaint, alleging air traffic controller negligence, is dismissed for failure to exhaust administrative remedies.  Plaintiff's attempt to amend his administrative claims was made beyond the date by which his request for reconsideration had been denied and beyond the statute of limitations for bringing new claims.  This claim has expired.  Defendant is entitled to summary judgment on Count II of Plaintiff's Complaint, alleging negligent maintenance of the aircraft, because all specific, factual evidence available supports the conclusion that Plaintiff executed an enforceable Covenant Not to Sue and Indemnity Agreement, releasing Defendant from liability, even for its own negligence.

Accordingly, it is **ORDERED** and **ADJUDGED**:

1.  Defendant's Motion to Dismiss and Motion for Summary Judgment (Doc. 29) is **GRANTED**.

2.  The Clerk is directed to dismiss Count I of the Complaint and enter judgment in

favor of Defendant on Count II.  Thereafter, the Clerk shall close this file.

      **DONE** and **ORDERED** in Chambers, Orlando, Florida this 3rd day of July, 2007.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Party